1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3

4  - - - - - - - - - - - - - x

5                                    :

6  JANE FITTS,                       :

7                                    :

8        Plaintiff,                  :

9                                    :

10       v.                          :  Case No.

11                                   :  1:98-CV-00617

12 FEDERAL NATIONAL MORTGAGE         :

13 ASSOCIATION and UNUM LIFE         :

14 INSURANCE COMPANY OF AMERICA,     :

15                                   :

16       Defendants.                 :

17                                   :

18 - - - - - - - - - - - - - x

19

20              Washington, D.C.

21              Wednesday, September 3, 2003

22

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700        800-336-6646        410-684-2550

33
ler

)

1          The deposition of TERRY E. GOLDBERG, Ph.D.,

2   called for examination by counsel for Defendant Unum

3   Life Insurance Company of America, in the

4   above-entitled matter, pursuant to notice, in the law

5   offices of Epstein, Becker and Green, 1227 25th

6   Street, N.W., Sixth Floor, Washington, D.C., convened

7   at 11:00 a.m., before Sandy Medford Nelson, a notary

8   public in and for the District of Columbia, when were

9   present on behalf of the parties:

10

11

12  APPEARANCES:

13      On behalf of the Plaintiff:

14          RICHARD B. MARRIN, ESQ.

15          Ford, Marrin, Esposito, Witmeyer & Gleser

16          Wall Street Plaza

17          New York, New York   10005

18          (212) 269-4900

19

20

21

22

1      On behalf of the Defendant, Unum Life

2       Insurance Company of America:

3         FRANK C. MORRIS, JR., ESQ.

4         ANDREA R. CALEM, ESQ.

5         Epstein, Becker & Green

6         1227 25th Street, N.W.

7         Sixth Floor

8         Washington, D.C.  20037-1175

9         (202) 871-1861

10

11

12

13

14

15

16

17

18

19

20

21

22

.83
iler

1                    C O N T E N T S

2

3                          EXAMINATION BY COUNSEL FOR

4    WITNESS                DEFENDANTS        PLAINTIFF

5    TERRY E. GOLDBERG, Ph.D.       5              --

6

7

8

9

10                    E X H I B I T S

11   GOLDBERG DEPOSITION EXHIBITS              MARKED

12   No. 1 - Subpoena                           10

13   No. 2 - Letter                             11

14   No. 3 - Medical Examination                24

15   No. 4 - Notes                              90

16

17

18

19

20

21

22

1                      P R O C E E D I N G S

2          Whereupon,

3                    TERRY E. GOLDBERG, Ph.D.

4     was called for examination by counsel for Defendant

5     Unum Life Insurance Company of America and, after

6     having been duly sworn by the notary public, was

7     was examined and testified as follows:

8              EXAMINATION BY COUNSEL FOR DEFENDANT

9              BY MR. MORRIS:

10

11

12

13

14

15

16

17

18

19

20

21

22

14183
Miller

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21      Q      NIMH is the National Institute of Mental

22   Health?

1183
iller.

16

1    A    Correct.

2    Q    And could you tell me what your position

3    is, please?

4    A    I'm Chief of the Unit on Experimental and

5    Neuropsychology in the Clinical Brain Disorders

6    Branch.

7    Q    How long have you held that position, sir?

8    A    I've held that position for approximately

9    ten years at the current level.

10    Q    Were you in that Unit, but not Chief

11    before--

12    A    Correct.

13    Q    --you became the Chief?

14    A    Correct.

1183
iller,

21

1

2

3

4

5

6      Q      Based on the work that you have done or

7    that you are familiar with in the field, is there

8    any way to conduct a test that will determine any

9    individual who has bipolar disorder?

10      A      You mean a diagnostic test?

11      Q      Yes.

12      A      Not that I know of.

1

2      Q    With regard to the work that you have been

3   involved in with regard to the study of genes and

4   relationship to bipolar disorder, is there anything

5   in the work that you have done or that you are

6   familiar with that shows a specific connection

7   between a specific gene or gene abnormality and the

8   existence in an individual of bipolar disorder?

9      A    No.  Could I expand a second on that?

10      Q    Yes.

11      A    There are some genes that have been

12   identified that slightly increase risk for the

13   disorder, but these genes have, you know, very

14   small effects.  And so, it's thought that, in

15   conjunction with a lot of other genes that

16   similarly increase risk, it could push the person

17   over some liability threshold.  But one gene in and

18   of itself has a very small effect, even though

19   statistically it could be shown to be related to

20   the disorder.  This is a very different approach

21   than, you know, let's say, having the genes for

22   Huntington's where if you have it, you're done for.

1      Q    There's a direct, specific correlation

2    between that gene and the Huntington's?

3         A    That's right.

183
ller

24

14    Q    Thank you very much.  Now, I want to make

15    sure there was only one report dated November 11th,

16    1999 that you produced in connection with

17    Ms. Fitts?

18    A    Correct.

19    Q    Okay.  Do you have any handwritten notes

20    concerning your sessions with Ms. Fitts?

21    A    My session?

22    Q    Sessions, excuse me.

183
ller.

1    A    Yes, I do.  I'm not sure if they came

2  through on the Xerox or not, but these are my

3  notes.  It's on the back side.

4    Q    I think the answer is, that didn't happen

5  when they were copied.

6    A    Okay.

7    Q    Is it just that one page?

8    A    Let me see.  Yeah.

9    Q    When we take a break, I'll make copies of

10  these for all of us.  Now, the typed report, which

11  is the first four pages of Exhibit 3, could you

12  tell me how that was prepared?

13    A    After seeing Ms. Fitts, I scored the

14  tests, and then generated a report probably within,

15  oh, a week to two weeks after seeing her.

16

17

18

19

20

21

22

5      Q    I'm going to ask you, since you've just

6    reviewed the handwritten notes, to take another

7    minute to look at your actual, typed report of

8    November 11th, 1999, Exhibit 3, and tell me if

9    there is any information contained in the

10    handwritten notes that is not contained in the

11    November 11th, 1999 report.

12      A    Sure.  There might be some direct quotes

13    from Ms. Fitts--

14      Q    That's what I'd be interested to know.

15      A    --that I sort of, you know, generalized.

16      Q    I would appreciate it if you would tell me

17    anything that is in the notes and not in the

18    report, particularly since it may help you

19    interpreting your handwriting versus me.

20      A    So for instance--and there will be many of

21    these actually where I think Ms. Fitts said her SAT

22    scores were not good, and I don't believe--at least

.4183
liller

1    I don't notice it in here--

2       Q    Okay.

3       A    --in particular.  There's some particular

4    answers to questions about autobiographical

5    information--like, where did she live as a

6    child--where I mention, in general, her

7    autobiographical memory seemed to be intact with

8    these very old memories.  But I didn't put, you

9    know, the exact questions and the exact answers.

10      Q    You reached the professional conclusion,

11   based on the fact that she was able to recall

12   those, that her autobiographical memory was good,

13   but you simply didn't record each of the details

14   that supported that?

15      A    Correct.

16

17

18

19

20

21

22

17     Q     Tell me, to the best of your recollection,

18 what was conveyed to you by Dr. Hyde.

19     A     That Dr. Hyde was concerned about

20 Ms. Fitts' memory complaints and that--given her

21 history depression, possible mania and ECT--he

22 wanted to assume a better, more quantitive

1    understanding of how dysfunctional her memory

2    system really was.

3        Q    With regard to the test that you chose to

4    administer, I assume there were some other tests

5    that you might have chosen that you--for one reason

6    or another--chose not to administer professionally?

7        A    Correct.

8        Q    If you had been advised that she

9    had--Ms. Fitts had--complained of memory problems

10   before her ECT therapy, would that have caused you

11   to want to conduct or use any tests in addition to

12   those which you used?

13       A    I think not, because the memory tests that

14   I used are really--they don't determine when the

15   person's memory impairment started, and I'm talking

16   specifically the Wexler Memory Scale and also the

17   California Verbal Learning Test.  So, I would have

18   used them irrespective of knowledge about her

19   memory complaints.

20       Q    You may need to take a moment to look at

21   your report, and please feel free to do so.  My

22   question would be, if you had been advised that her

83
ler

1    memory complaints started before her ECT therapy,

2    would your report have been changed or your

3    conclusions altered in any way by that information?

4              MR. MARRIN:  I'll object just to the form.

5    Keep going on.

6              BY MR. MORRIS:

7         Q    Do you understand the question?

8         A    If you'll allow me to editorialize, it's a

9    good question.  I think the answer is no, because

10   if you note in my report that--

11        Q    Do you want to direct our attention to any

12   place in here?

13        A    Yeah.  That pattern of memory impairments

14   was somewhat atypical for depression or ECT--I

15   should say to ECT-related cognitive impairments.

16   So that being the case, I mean, it's not a typical

17   pattern for depression.  It's not, in my

18   experience, a typical pattern following ECT.  So,

19   I'm sort of left with the conclusion that whatever

20   this is, it's a little bit unusual, and I think I

21   would have come to that.

22             And, you know, the reality is, you know--I

1    mean people with depression usually have memory

2    impairments, and the memory impairments often are

3    mild to moderate, but sometimes they can be more

4    severe.  So, it wouldn't be unexpected to find

5    memory impairments, but it's sort of the nature of

6    them.  And I have every faith in you that we'll get

7    into that in a little bit.  I'll try to expand, if

8    you will.

9        Q    We'll try and give you that opportunity.

10       A    Thanks.  And it may be a long run for a

11   short slide, but I think I would have come to the

12   same conclusion, that this is an unusual set of

13   findings, irrespective of when precisely they

14   developed.

15       Q    Just to be clear, as an example on page

16   one of your report, the third paragraph of

17   Exhibit 1 (sic).  It's the paragraph that starts

18   with, Ms. Fitts said after her ECT treatment.

19   We're on the same paragraph?

20       A    Yes.

21       Q    I'd like to refer your attention to the

22   last two sentences of that paragraph where it

183
ller

36

1   states, most recently on a trip to India, she had

2   difficulty processing information.  Additionally,

3   she does not read because she cannot remember the

4   content of books.  With regard to that information,

5   as well as other information in this report of a

6   similar nature, that is all Ms. Fitts'

7   self-reporting, correct?

8        A    Correct.

9        Q    And you have no basis for knowing whether,

10   in fact, on a trip to India she had difficulty

11   processing information?

12       A    Correct.

13       Q    And you have no basis for knowing whether

14   she does or does not read and whether, in fact, she

15   had trouble remembering the content of books?

16       A    Correct.

17       Q    And that would be true of similar,

18   specific things that have been reported that are

19   reflected in this report, reports by Ms. Fitts, but

20   for which you have no independent verification?

21       A    Yes.  On the other hand, I had no reason

22   not to believe her either.

83
ler

1      Q    And similarly on the top of page two of

2   your report, Exhibit 3, you write at the very

3   beginning sentence, Ms. Fitts may have a history of

4   ADHD.  Was that based on self-reporting or on

5   anything that you saw?

6      A    Based on self-report.

7      Q    Okay.  Now, continuing on in that first

8   paragraph on page two of your report, Exhibit 3,

9   the second--excuse me--the third and last sentence.

10  Currently, Ms. Fitts has difficulty focusing and

11  frequently does several things at once paren

12  perhaps because she is distracted end of paren.

13  Now with regard to that particular statement, isn't

14  that simply what is frequently referred to in the

15  vernacular these days as multitasking?

16             MR. MARRIN:  Objection to form.

17             THE WITNESS:  Here's my take on that.  In

18  the context that--and I'm, again, trying to

19  reconstruct this from my memory and trying to parse

20  the sentence, given how I usually think about these

21  things--that she was not happy about these kinds of

22  sort of flitting from one activity to another.

1    That it was more the fact that she couldn't sustain

2    work on one thing as opposed to really getting lots

3    of stuff done simultaneously.

4              But, Frank, I have to be quite honest with

5    you.  I'm guessing about that, and that's based

6    more sort of on, you know, what the flow of that

7    paragraph was, you know, what the syntax of the

8    sentence was.  Let me put it this way:  I don't

9    think she saw that as a real plus, and that's why I

10   say that.  I mean, there's multitasking and there's

11   multitasking.  I mean, you could do a bad job on a

12   lot of things at once, and you could do a good job

13   on a lot of things at once.

14

15

16

17

18

19

20

21

22

1    Q    I'd like to turn your attention,

2  Dr. Goldberg, to the fifth paragraph on your

3  report, the one that begins with clinically.

4    A    Yes.

5    Q    Okay.  First, you report that she was

6  pleasant and cooperative throughout the interview.

7  Then, you say her speech was well-organized

8  coherent and relevant.  And you go on to state, she

9  was able to give her history with economy and in an

10 orderly fashion.  Now with regard to that

11 recounting of your clinical encounter with her, I

12 take it that her memory did not interfere with her

13 being able to record and give you her history, as

14 you say, with economy and in an orderly fashion?

15    A    That's correct.

16

17

18

19

20

21

22

183
ller

14      Q    Now, in the next paragraph, the sixth

15   paragraph on page two, Exhibit 3, that begins,

16   Ms. Fitts noted she often has much difficulty

17   making decisions.   With regard to her

18   decision-making and any difficulty if, in fact, it

19   existed, do individuals with depression exhibit

20   frequent difficulty in decision making?

21      A    "Frequently" is always a tough word, but

22   individuals with depression sometimes can have

4183
iller

1    difficulties making decisive judgments about

2    things.

3        Q    Okay.

4        A    So, yeah.

5        Q    Okay.

6        A    They sometimes have trouble.

7        Q    Let's try and define a little between--I

8    understand you're having trouble with "frequently?"

9        A    Yeah.

10

11

12

13

14

15

16

17

18

19

20

21

22

183
ller

10      Q    All right.  Page three of the report is

11   probably the page of somewhat greater interest in

12   your professional expertise.  I think it would

13   probably be helpful if--the first paragraph you

14   note each of the tests that you administered.

15   Perhaps, if you would run through each of those and

16   give us a brief description of the test and what it

17   is you believe you would be able to learn something

18   about as a result of giving Ms. Fitts each of those

19   tests.

20      A    Sure.  I'd be happy to.  So, the Waysar

21   (sic) is an IQ test that is used to quantitate

22   general intellectual efficiency, or at least that's

1183
iller

1    the way I use it in this evaluation.  The Wexlar

2    Memory Scale advises, examines, what's now called

3    episodic, that is how well people learn new

4    information.  And that's based on a variety of

5    subtests, including memory for designs, verbal

6    impaired associate learning, memory for stories.

7         The next test, which is the California

8    Verbal Learning Test, is another measure of

9    episodic memory, and that primarily involves

10   learning a 16-word list over repeated trials.

11        Q    Let me stop you there for one second.

12        A    Yes.

13        Q    That's the kind of a test which--if

14   someone did a little strategizing and studying on

15   how to manipulate that kind of information--one

16   could change rather significantly their score,

17   correct?

18        A    Yes, correct.

19        Q    So, the strategy for SAT preparations is

20   there are certain kinds of constructs, which, if

21   you practice them, you could significantly enhance

22   your score?

4183
i1ler

1      A    Yes, by looking for associations in

2    between the words, by mentally rehearsing them.    I

3.   assume that's what you mean.

4      Q    Yeah.

5      A    Absolutely correct.    And, in fact, in my

6    eyes--and we have some research to back it

7    up--that's what makes it a somewhat less effective

8    tests than some of the tests on the Wexler Memory

9    Scale, which, more or less, involves sort of more

10   brutal force memory than the California, which is

11   where a lot of sort of strategic types of memory

12   processing really can go a long way towards

13   improving or worsening the score--

14     Q    All right.    Sorry to interrupt you.

15     A    Not at all.    Then, there are two

16   tests--Trails A and Trails B--that have a lot to do

17   with mental processing speed.    One is a slightly

18   harder version than the other.    The Gordon CPT is a

19   test of sustained attention and vigilance that

20   involves rapidly encoding stimuli, which are being

21   flashed on a screen quite quickly at about the rate

22   of one per second and making a rapid decision about

1   those stimuli about whether it's a target or not,

2   basically.

3           Verbal fluency involves speedy retrieval

4   from the person's mental lexicon, in other words,

5   their mental vocabulary.  Boston Naming involves

6   another--is another language test that involves

7   simply being able to names pictures of things.

8   Face Recognition is a test of a specific kind of

9   visual processing and that is object

10  identification.  That it's a perceptual test.

11          Wisconsin Card Sort is a test of executive

12  function--so-called executive function--that

13  involves abstraction, set shifting and response to

14  feedback.  And then I also administered simple,

15  short-term working memory tasks from the Wexler

16  Memory Scale revised, which is the ability to sort

17  of hold information online for very, very short

18  periods, several seconds.

19          And then also one or two tests did not get

20  on that list, including wide-range reading, which I

21  use not really as an indicator of reading ability,

22  but as an indicator of premorbid intellectual

48

1    function.  It turns out that reading is resistant

2    to a lot of types--not every type, but a lot of

3    types--of brain damage.  So, you could use it to

4    sort of gauge where a person was before all the bad

5    things in their life started happening.

6        Q    So, let me make sure I understand the last

7    one.

8        A    Yeah.

9        Q    So that you would get a--

10       A    Do you want me to explain it?

11       Q    Yes.

12       A    Let's take an extreme case.

13       Q    Um-hum.

14       A    A person, you know, is probably pretty

15   smart.  They have a--they receive a terrible brain

16   injury in a car accident.  They take an IQ test.

17   Their IQ is now low.  Let's say, for the sake of

18   argument, 85.  But you know--look, they went to

19   college; they, you know--

20       Q    Good employment--

21       A    --but you want to really document where

22   they were.

1      Q     Um-hum.

2      A     --beforehand.  In many cases you could

3   give a test like the Wide-range Achievement Test

4   reading, and reading holds up surprisingly well to

5   a lot of different types of brain damage,

6   including, you know, from my standpoint, which is

7   really important, to even schizophrenia where there

8   is a big drop in intellectual function, but reading

9   is maintained at a fairly high level, or at the

10   premorbid level.  So, I just use it to sort of

11   gauge where the person was at their highest level

12   of functioning.

13      Q     Okay.  And the results on the Wide-range

14   Reading Test, are those reflected in the report?

15      A     Yeah, they are.

16      Q     And where would that be?

17      A     The last two sentences of the second

18   paragraph.

19      Q     I see.

20      A     No, sorry.  It should have been in the

21   test administered, section two.

22

‡183
iller

58

1

2

3

4

5

6

7

8

9

10      Q      Do you know how long it had been from the

11   time when Ms. Fitts had had her ECT treatments to

12   when you saw her?

13      A      As best as I could make it out, that she

14   had a second course of ECT possibly in '96, maybe I

15   think '97, and then I saw her in '99.  So, it would

16   be three years approximately.

17      Q      Are you familiar with the literature

18   concerning effects of ECT on memory?

19      A      Familiar with some of it.

20      Q      Would it be correct to say that that

21   literature does not support long-term memory

22   effects of ECT therapy?

183
ller

1      A    Do you mean the ability to acquire new

2   information after ECT?  Is that what you're talking

3   about?

4      Q    Let's take that one.

5      A    Yeah.  The literature supports that, you

6   know, after, let's say, three to six months,

7   basically, you know, in general the person's memory

8   goes back to baseline, whatever that baseline was.

9   Now a lot of time, the baseline is not so normal,

10  but, yeah.

11     Q    And, in fact, the literature doesn't

12  really support that after--whatever, three to six

13  months--that there is any established pattern of

14  long-term impact on memory?

15     A    Yeah.  I think I said that in the report

16  on the last page in the last couple of sentences of

17  the summary paragraph.

18     Q    I'm sorry.  Could you show me where

19  physically?

20     A    Yeah.

21     Q    Oh, okay.  The doctor was referring to the

22  fourth page of his report, Exhibit 3, in the final

L83
Ller

1    couple of sentences on the second paragraph wherein

2    it stated, it should be noted that this profile is

3    not typical of depression where there is more

4    difficulty in immediate memory while savings are

5    adequate.

6         In addition, anterograde memory problems

7    after ECT usually resolve within three months,

8    though some patients continue to experience

9    difficulties for far longer periods--finish the

10   paragraph--retrograde memory for both

11   autobiographical material and semantic material

12   appear relatively intact.

13

14

15

16

17

18

19

20

21

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14    Q    My questions was the part that I think you

15    answered in the middle which is, if we were in

16    interested in the etiology of where any memory

17    issue arose from, and particularly with regard to

18    trying to determine if depression was the or a

19    principal cause, if there are any tests that we

20    would specifically turn to for that purpose, and I

21    think your answer to that is no?

22    A    No.

15    Q    So, you don't know how her scores on the

16    tests that you administered would have differed

17    with, been consistent with or been different from

18    similar or other tests that could have been

19    administered at any earlier point in her life?

20    A    With the possible exception of IQ where I

21    spoke about this morbid intelligence versus her

22    current IQ, that suggested that there had been some

1    drop in general intellectual efficiency.

4183 .
iller

1

2      Q    In the testing that you gave, if Ms. Fitts

3   has been telling herself that she has memory

4   problems for some period of time and now is being

5   examined, is there any potential for her results

6   being impacted by her own perception or belief that

7   she had memory problems?

8         MR. MARRIN:  Objection as to form.

9         THE WITNESS:  Yes, absolutely.  But--and

10   it's a big butt--on many of them she did

11   surprisingly well, and this was usually in

12   immediate memory.  The bulk of her memory

13   impairments were for memory after the delay of, you

14   know, 20 or 30 minutes.

15         So, I mean, if you're going to convince

16   yourself that you have memory impairments, you

17   might as well show those memory impairments from

18   the go.  I mean, why wait to show it?  So, yeah,

19   it's certainly a possibility that people can

20   amplify their impairments, but it's a very unusual

21   pattern in her case.  I mean if you're going to,

22   you know, try to show someone you have a memory

14183.
Miller

1    problem why not show it, you know, right at the

2    beginning?

3          But nevertheless, you know, her pattern

4    was rather unusual that she had, you know, much

5    greater impairments after delay. By that, I mean

6    it's unusual for depression, and that also was of

7    concern to me in terms of, you know--you know, is

8    this some atypical presentation of something else.

9

10

11

12

13

14    :

15    ]

16

17

18    y

19    ε

20    π

21    m

22    k

8    Q    What I'd like to examine is the kinds of

9    tests that she exhibited some slowness in speed of

10   performance and how those would relate to

11   functioning in a professional environment, if there

12   is a specific relationship, and there may not be.

13   A    There are a couple of ways to look at it.

14   One is that--I mean, the way I think about speed of

15   processing is a couple of things.  One, is that if

16   you could get material into and out of, let's say,

17   some mental blackboard that you have, and a

18   blackboard always has sort of a specific capacity--

19   you know, it's not infinite capacity--that you

20   could sort of do more information processing per

21   unit of time.  If you're getting stuff onto that

22   blackboard quickly--right--because you're clearing

.4183
liller

68

1    up space, and you can do more.

2        Q    Okay.

3        A    So that's sort of one way to look at how

4    speed of processing could play out, that it allows

5    you to do a lot more information processing per

6    unit of time, and there's been a lot of research

7    work on it.  Another way to look at it is, if

8    you're trying to do a routine task--a task that

9    you've done many times before, tasks that don't

10   take a lot of thought--you don't want to get

11   distracted or put a lot of thought in; you just

12   want to sort of get it done as quickly as possible,

13   again, to free yourself up for tasks that are more

14   exacting, I assume.

15       So, I kind of think speed of processing is

16   playing out sort of like an internal realm and an

17   external realm, if you would.  I mean, there is,

18   you know, a fair amount of psychiatric literature

19   and literature from the traumatic brain injury

20   field that shows that speed of processing is

21   related to functional outcome, that people who are

22   better or faster tend to do better vocationally

83
ler

1    than people who are slower.  And, I mean, you

2    know--I mean, you know, in general, if you could

3    maintain the same accuracy level rather quick than

4    slow.

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q    Now at the top of page four, you talked

19    about tests of executive function and the working

20    memory.

21    A    Um-hum.

22    Q    Would that be the test that would be most

1    directly relevant to working in an executive or

2    professional capacity, among those that you

3    administered?

4        A    It would certainly be one of the most

5    relative tests.

6        Q    And, on that test, her performance was not

7    just in the normal range, but, indeed, was

8    superior?

9        A    Correct.

10

11

12            --

13

14

15

16

17

18

19

20

21

22

18      Q     Could any of the poorer results on

19   Ms. Fitts' exams that you administered been the

20   result of malingering?

21      A     Well, I didn't view this as a

22   medical-legal examination, as it wasn't.  So, I

83
ler                                                                              86

1    didn't give formal tests of malingering, and there

2    are some good ones out there.  But, in my view, on

3    tests where it would be fairly easy and/or relevant

4    to do poorly, she didn't do so poorly.

5          So, you know, again, if you were

6    malingering on the Wisconsin where she did very

7    well and I'm giving her feedback after each trial,

8    well, she would easily titrate her performance and

9    start doing worse.  Or, on the memory tests, for

10   instance, where, you know, she would have--where

11   she could have done quite poorly on even the

12   immediate memory, she did not.

13         So, I mean my clinical impression--and,

14   again, it's, you know, based on this glimpse of

15   her--was, no, that she wasn't malingering to fake

16   bad in the interests of her disability payments.

17

18

19

20

21

22

16    Q    We're very close to done.  You may have

17    given a little comment, but I want to direct your

18    attention to the second to the last paragraph of

19    your report, right at the end where you state, it's

20    noted that Ms. Fitts does suffer from

21    obsessive-compulsive disorder, though she probably

22    does not meet the criteria for it.  Do you see

1    that?

2         A    Yes.

3         Q    Could you explain that?

4         A    Yeah.  I mean, based on my recollection of

5    the DSM-IV symptom checklist, she had several

6    symptoms of obsessive-compulsive disorder, but she

7    probably didn't have enough symptoms, including a

8    couple of the ones that are important, including

9    hand washing or counting.  She did not have these.

10        So, you know, based on what I thought the

11   DSM criteria were, I didn't think she would meet

12   criteria for a formal diagnosis.  But like many of

13   these diagnosis, they turn out to be rather

14   dimensional, and they are not as all or none as

15   people once thought.

16

17

18

19

20

21

22

:183
.ller

1

2

3

4

5

6

7

8

9

10

11    Q    I think there may be two questions I want

12    to ask you.  You estimated, based on your testing

13    her IQ, Ms. Fitts' IQ was at 105?

14    A    Correct.

15    Q    Is that consistent with her background of

16    successfully completing college and having worked

17    as an attorney?

18    A    No.  That's why that sort of premorbid IQ

19    surrogate--that was more consistent with that

20    because that indicated her premorbid IQ.  I think

21    it ran 115 or 116, something like that.

22    Q    Could her depression be a factor in the IQ

1  testing that was done?

2      A    Yes.  I mean, it's not generally the case,

3  though.

4      Q    So--

5      A    That depression leads to an IQ drop, but

6  nevertheless, I've seen it in other cases, and I

7  wouldn't rule it out.  It's atypical, though.

8      Q    Would potentially an effective

9  psychotropic medication be manifested in terms of

10  her IQ test scores?

11      A    I think that's probably less likely, based

12  on what I know about the medications.

13      Q    Would the fact that she had apparently

14  formed the belief that she could not function at

15  that time as an attorney, or as a professional

16  individual, potentially manifest itself in her

17  scoring?

18      A    It could, but, again, I'd be sort of--it

19  would be hard to come up with why she'd do really

20  well on the premorbid IQ test.  Why not also do

21  rather poorly on that, and then those other

22  examples I gave you earlier?

# CERTIFICATE OF NOTARY PUBLIC

I, SANDY MEDFORD NELSON, the officer before whom the foregoing deposition was taken, do hereby testify the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me stenographically and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto nor financially or otherwise interested in the outcome of the action.

*Snelson*
_____
SANDY MEDFORD NELSON

Notary Public in and for
the District of Columbia

My commission expires:  December 14, 2007