# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

JANE FITTS,

                    Plaintiff,

          v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA,

                    Defendant.

**Civil Action 98-00617 (HHK)**

---

## MEMORANDUM

Jane G. Fitts, a former employee of the Federal National Mortgage Association ("Fannie

Mae") diagnosed with bipolar disorder, brings this action against Unum Life Insurance Company

of America ("Unum"), Fannie Mae's employee disability insurance provider.  Fitts claims that

Unum violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1001 *et seq*., because, after she left Fannie Mae on disability, Unum terminated long term

disability payments to Fitts after twenty-four months under a provision of Unum's disability

policy that so limits benefits for disabilities due to "mental illness."[1]

---

[1]  This is the fourth time this court has had occasion to consider Fitts's claims.  Fitts left
Fannie Mae on short term disability in May 1995.  In November 1995, Unum determined that
Fitts was disabled due to bipolar and/or borderline personality disorder, and authorized her
receipt of long term disability ("LTD") benefits under the applicable policy.  On November 9,
1997, Unum terminated payment of Fitts's LTD benefits on the ground that the policy limited
benefits for a "mental illness" to twenty-four months.  Fitts filed the present action in 1998, the
lengthy history of which is recounted more fully in previous opinions written in this case.  *See
Fitts v. Federal Nat'l Mortgage Ass'n*, 236 F.3d 1, 2–3 (D.C. Cir. 2001); *Fitts v. Unum Life Ins.
Co. of Am.*, No. 98-00617, slip. op. at 3–4 (Feb. 23, 2006).

Having previously determined that bipolar disorder is not included in the mental illness limitation of the policy, this court conducted an evidentiary hearing to determine (1) whether Fitts suffers from bipolar disorder as she claims or some other disabling disorder; (2) whether she is disabled; and (3) whether the cause of her disability is bipolar disorder.  For the reasons set forth in the following findings of fact and conclusions of law, the court answers each question in the affirmative.

**FINDINGS OF FACT**

**I.      Fitts Has Bipolar Disorder**

**A.      Definition of bipolar disorder**

1.      Bipolar disorder, also known as manic depressive illness, is a physiological brain disorder that can cause dramatic mood swings, bouts of depression and hyperactivity, unusual shifts in energy levels, and an inability to function.  *See Stedman's Medical Dictionary*, 460, 508, 1061 (26th ed. 1995).

2.      According to the diagnostic criteria in *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. text rev. 2000) ("DSM-IV"), acknowledged by both parties as authoritative, the essential features of bipolar disorder include the occurrence of "manic episodes" or "mixed episodes" of mania and depression, as well as the occurrence of "major depressive episodes."  DSM-IV at 382.

3.      A "manic episode" is a distinct period of an abnormally and persistently elevated, expansive, or irritable mood disturbance, characterized by the persistence of at least three of the following symptoms: (1) inflated self-esteem or grandiosity; (2) decreased need for sleep; (3) more talkative than usual; (4) racing thoughts; (5) distractibility; (6) increase in goal-oriented

2

activity (either socially, at work or school, or sexually) or psychomotor agitation; and/or (7)

excessive participation in high-risk pleasurable activities (e.g., spending sprees, sexual

indiscretions, or foolish business investments).  DSM-IV at 362.  A manic episode must be

severe enough to cause marked impairment in occupational or social functioning, to require

hospitalization, or to cause the individual to display psychotic features.  *Id.*

4.      A "major depressive episode" is a period of depression lasting at least two weeks

which is characterized by at least five of the following symptoms nearly every day: (1) depressed

mood; (2) markedly diminished interest or pleasure in activities; (3) significant weight loss or

gain, or decreased appetite; (4) insomnia or excessive sleepiness; (5) psychomotor agitation or

retardation (observable by others); (6) fatigue or loss of energy; (7) feelings of worthlessness or

excessive or inappropriate guilt, which may be delusional; (8) diminished ability to think or

concentrate, or indecisiveness; and/or (9) recurrent thoughts of death, suicidal thoughts, or a

suicide attempt.  DSM-IV at 356.  The symptoms must cause clinically significant distress or

impairment in social, occupational, or other important areas of functioning.  *Id.*[2]

5.      A "mixed state episode" occurs when a person experiences the symptoms of a

manic episode and a major depressive episode every day for a week and the disturbance is

sufficiently severe to cause marked impairment in occupational or social functioning, to require

hospitalization, or the person displays psychotic features.  DSM-IV at 365.

6.      Bipolar disorder is a recurrent disorder in which a majority of patients experience

chronic interpersonal or occupational difficulties between acute episodes.  DSM-IV at 386.  An

---

[2]  The symptoms must not be due to the effects of a substance, general medical condition, or bereavement.  DSM-IV at 356.

individual is more likely to develop bipolar disorder if a family member has suffered from bipolar or depressive disorder, and studies have provided "strong evidence" of a genetic influence.  *Id.* at 386.  More than ten percent of those diagnosed with bipolar disorder commit suicide.  *Id.* at 384.  Other associated problems include occupational failure, episodic antisocial behavior, alcohol or substance abuse, anorexia or bulimia, attention-deficit disorder, panic disorder, social phobia or borderline personality disorder.  *Id.* at 384, 394.[3]

**B.     Fitts's diagnoses of bipolar disorder**

7.     Fitts, now 57, has suffered from severe mood swings, depressive and manic episodes, suicide attempts, and an inability to function since at least 1995, according to her treating physicians and medical records.  Dr. Suzanne J. Griffin, M.D., a Board-certified psychiatrist and certified psychopharmacologist, with more than twenty-five years of clinical experience, has treated Fitts for more than ten years and has diagnosed her as bipolar.  Griffin Direct at 3–9; Pl's Ex. A (Griffin's C.V.); Tr. I 167:15–18.[4]

8.     Dr. Thomas Hyde, M.D., Ph.D., a neurologist and psychiatrist who has treated Fitts for more than seven years, has diagnosed her as bipolar.  Hyde Direct at 3–8; Tr. I 121:12–15.  Dr. Hyde is a Board-certified neurologist, a senior staff scientist in the

---

[3]   The DSM-IV distinguishes between Bipolar I Disorder and Bipolar II Disorder.  DSM-IV at 392.  Bipolar I is characterized by a manic or mixed episode, and is often characterized by, but does not require, a previous major depressive episode.  *Id.* at 388.  Bipolar II is characterized by a hypomanic episode, a less severe form of a manic episode, and it requires a previous major depressive episode.  *Id.* at 397.  For the purposes of this opinion, however, the court will use the term "bipolar disorder" to refer generally  to both diagnoses.

[4]   The evidentiary hearing was held on December 14–15, 2006.  "Tr. I" refers to the transcript of the first day; "Tr. II" refers to the transcript of the second day.

4

neuropathology section of the brain disorders branch of the National Institute of Mental Health, and a clinician with more than eighteen years of experience.  Pl.'s Ex. I (Hyde C.V.).

9.      Dr. Frederick K. Goodwin, M.D., acknowledged by both parties as one of the world's leading authorities on bipolar disorder, *see* Tr. II 65:23–25 (Ratner), diagnosed her as bipolar after evaluating her in 1996 and 2006, Goodwin Direct. at 4.  Dr. Goodwin, a medical doctor, research psychiatrist, and psycho-pharmacologist, is the co-author of one of the preeminent textbooks in the field of bipolar disorder, *Manic-Depressive Illness* (Oxford Univ. 1990).  Goodwin Direct at 2–3.[5]  He is a research professor in psychiatry at the George Washington University Medical Center and the former director of the National Institute of Mental Health.  Pl.'s Ex. K (Goodwin Bio.).  He has authored 460 publications, most of which concern bipolar disorder, and he currently treats more than 140 bipolar patients.  Goodwin Direct at 2–3; Pl.'s Ex. K (Goodwin Bio.); Pl.'s Ex. L (Goodwin C.V.).  In March 1996, prior to this insurance coverage dispute, Dr. Goodwin evaluated Fitts in a diagnostic and treatment consultation and diagnosed her as bipolar.  Tr. I 17:16–20.  Dr. Goodwin reevaluated Fitts in October 2006 to follow up on her treatment because she had decided to call him as a witness.  Tr. I 11:5–19, 12:10–13:6.  He confirmed his earlier diagnosis that she had bipolar disorder.  Tr. I 77:19–20.  Dr. Goodwin testified that in October 2006, "[s]he had the same diagnosis that her psychiatrist had given her, Georgetown University had given her, Hopkins University had given her and three of [Unum's] experts had given her," all of which were bipolar disorder.  Tr. I 16:23–17:13.

---

[5]  Dr. Goodwin's co-author, Dr. Kay Redfield Jamison, has received international recognition for her research on bipolar disorder as well as her personal account of her own struggles with the illness in *An Unquiet Mind* (Picador 1997).

10.     Treating physicians at Johns Hopkins Hospital and Georgetown University Hospital also diagnosed her as having bipolar disorder when she was hospitalized twice in 1997 and again in 2004.  Pl.'s Ex. E at 4 (Hopkins Final Progress Note, 12/3/97); Pl.'s Ex G at 4 (Georgetown Discharge Summary 12/19/97); Pl.'s Ex. H at 4 (Georgetown Discharge Summary on 8/2/04).

11.     By 1995, her treating physicians Dr. Bernard Vittone and Dr. Terence Ketter had diagnosed her as having bipolar disorder.  Def.'s Ex. 27 (Vittone's Notes); Ex. 9 at 1 (Polk Letter).

12.     In June 1995, Dr. William J. Polk, a psychiatrist and neurologist, conducted an evaluation of Fitts for her employer, Fannie Mae, in which he concurred with her physicians' diagnoses of bipolar disorders.  Def.'s Ex. 9 at 1–2 (Polk Letter).  After evaluating her personally and speaking with Dr. Ketter, Dr. Polk reported to Fannie Mae that he "agree[d] with the diagnosis of Bipolar Type II." *Id.* at 1.  Dr. Polk observed that "[t]here have been repeated periods of sick leave related to a diagnosis of Bipolar Disorder Type II, for which she is currently in treatment with Dr. Terence Ketter." *Id.* at 2.  He observed that she was "currently in a mixed state, including depression and periods of hypomania at the time of her outbursts." *Id.*  Dr. Polk recommended that she be separated from Fannie Mae on disability.

**C.     Fitts's family and medical history also confirm her diagnosis as bipolar disorder**

13.     Fitts's father and brother, both now deceased, suffered depression and likely had bipolar disorder.  Def.'s Ex. 9 at 2 (Polk Letter); Tr. I 180:12–181:2.  Her father died when she was ten; her older brother committed suicide around 1987.  Tr. I 177:10–11; 180:3–6.

6

14.     In 1988, Fitts (then thirty-nine years old) began receiving treatment from Dr. Ketter for mood disorder and major depressive episodes. Def.'s Ex. 26 (Ketter Notes). Dr. Ketter later diagnosed her as bipolar. In 1993, he began treating her with lithium, a mood stabilizer used to treat bipolar disorder, which she discontinued later that year. *Id.* (4/20/93). In 1994, he prescribed Depakote, another mood stabilizer used to treat bipolar, after a severe episode which precipitated her departure from Fannie Mae. *Id.* (8/27/94).

15.     In 1994, Fitts sent a "bizarre letter" to Fannie Mae's chief executive officer ("CEO") discussing a delusional romantic relationship which, among other things, gave him three "options": promote her, pay her off with a "golden parachute" or make her his "wife #3." Def.'s Ex. 25 (Haines Notes 11/15/95); Def.'s Ex. 26 (Ketter Notes 6/27/94). Following this incident, she was asked to take sick leave. Def.'s Ex. 26 (Ketter Notes 6/27/94).

16.     Around the time of the incident, Fitts reported to Dr. Ketter that she believed that God messaged her when she saw the Fannie Mae CEO and that she "could see through his eyes into his soul." Def.'s Ex. 26 (Ketter Notes 7/12/94). She had apparently had an "obsession" with this delusional "preoccupation" for over a year. *Id.* Fitts also reported paranoid delusions that she had been "directed by the spirit," *id.* (7/12/94), and that the CEO was "orchestrating" the events leading to her departure, *id.* (7/22/94). Although Dr. Ketter first noted that he thought this was a "fantasy/obsession" rather than mania, *id.* (7/10/94), he repeatedly inquired whether Fitts was experiencing hypomania (which she denied), *id.* (7/22/94; 8/12/94) and he began discussions with her about whether lithium would be effective in treating her symptoms, *id.* (7/12/94).

7

17.     Dr. Griffin testified that Fitts continued to have this delusion regarding the CEO over a number of months even after she left Fannie Mae, Tr. I 144:4–21, and she concluded that Fitts's delusion about the CEO was a result of a psychotic episode, Griffin Direct at 4.  Dr. Griffin testified that Fitts has experienced numerous psychotic episodes, some of which she has observed.  Tr. I 143:9–22.  During these episodes, Dr. Griffin testified that Fitts "believed that she was communicating with God, that she was receiving messages from God, that demons were controlling her life, that she was cursed by God, that at one point, she was God."  Tr. I 143:19–22.  Her psychotic states continued until about 2000, when they stopped for about a three year period.  Tr. I 145:3–12.

18.     Fitts has experienced psychosis as recently as 2004, when Dr. Griffin observed that Fitts's mixed state of depression and hypomania "reached a crisis point and she became psychotic."  Griffin Direct at 8.  Griffin observed that "Jane was confused and agitated.  Her speech was slurred.  She was having panic attacks."  *Id.*  Griffin contacted Fitts's sister and arranged to have Fitts hospitalized at Georgetown.  *Id.*

19.     Dr. Griffin has personally observed Fitts in a hypomanic state, most recently in 1997.  Tr. I 157:4–7.  Since then, Fitts has had hypomanic symptoms, but not a full blown manic episode.  Tr. I 157:8–13.  Dr. Ketter also observed Fitts in several manic or mixed states, including a mixed episode in May 1995.  Def.'s Ex. 26 (Ketter Notes 5/30/95).

20.     Fitts has been repeatedly hospitalized for suicidal thoughts or behavior, in 1996, twice in 1997, in 1999 and again in 2004.  Griffin Direct at 6–8; *see* Pl.'s Exs. B–G (hospital records of admissions for suicidal thoughts or attempts).  In December 1996, for example, Fitts was hospitalized at Sibley Memorial Hospital for over a month after taking an overdose of

medication in a suicide attempt.  Pl.'s Ex. C (Sibley Clinical Resume 1/27/97).  She has recurrent

suicidal behavior and has frequently experienced suicidal thoughts.  Tr. I 137:8–9.

21.     Fitts has experienced major depressive episodes so severe that she was treated

with electroshock treatment ("ECT").  During her hospitalization at Sibley in 1996, Fitts received

ten treatments of ECT, and she continued with a course of periodic outpatient ECTs after her

discharge through October of 1997.  *See* Pl.'s Ex. C (Sibley Clinical Resume 1/27/97).

22.     Fitts has taken numerous prescription medications for bipolar disorder since

leaving Fannie Mae, including lithium, Depakote, Lamictal and other drugs aimed at stabilizing

her mood.  Tr. I 159:1–164:10.  In December 2006, Fitts was taking Depakote (a mood stabilizer

for bipolar patients), Nortriptyline (for depression), and Namenda (for memory loss).  Griffin

Direct at 9.

23.     Fitts has physical manifestations associated with having bipolar disorder.  She

suffers from severe headaches which are caused by her bipolar disorder. Tr. I 181:17–18,

181:24–182:5; Hyde Direct at 4.  She has complained of fatigue and rapid heart rate, two other

physical symptoms associated with bipolar disorder.  Goodwin Direct at 11.  She suffers from

memory loss and other cognitive deficits, caused by bipolar disorder, which have "continued to

worsen over the years," in Dr. Hyde's observations.  Tr. I 95:10–16; Tr. I 115:15–18.

24.     There are numerous studies confirming the relationship between bipolar disorder

and cognitive deficits.  Tr. I 33:7–34:10 (Goodwin); Tr. I 122:1–5 (Hyde).  Dr. Goodwin

explained that bipolar patients suffer "brain damage . . . as a result of the episodes, particularly

depressive episode where you get secretion of a lot of steroids that are toxic to the brain.  And

over time, the average bipolar patient loses intellectual function." Tr. I 42:5–10.  He further

explained that

> bipolar patients spend two-thirds of their illness time in depression . . .[and] most
> of the dysfunction from the bipolar comes from the depression side.  And when
> you're depressed, you secrete corticosteroids, and those corticosteroids have been
> shown to be neurotoxic, both in human studies and animal studies, particularly
> damaging parts of the brain that involve memory and selective memory in
> deciding what's important to remember.

Tr. I 43:1–11.  Dr. Goodwin testified that the loss of cognitive function and deterioration of the

brain are documented in the Neurophysiology chapter of his authoritative book,  *Manic*

*Depressive Illness*.  Tr. I 42:4–5, 12–19.

      25.      Fitts's treating physicians testified that, in recent years, depression has been Fitts's

primary state.  Griffin Direct at 5–6; Hyde Direct at 4.  Dr. Goodwin testified that bipolar

individuals spend most of their time in depression with some of the following symptoms:

> Inability to stay asleep, waking up in the middle of the night, or in the opposite,
> wanting to sleep all the time, changes in sexual function, changes in appetite, all
> of these things normal people can experience, but the issue is duration.  In the
> clinically depressed person those symptoms, those lack of functions go on
> relentlessly, week after week, month after month, year after year.  And it's the
> relentlessness of it that moves it from a normal state, or depression as a symptom,
> into depression as a disorder.

Tr. I 79:8–16.  Dr. Goodwin explained that the depressive episodes of bipolar patients are the

cause of most of their dysfunction:

> [T]he major issue for patients with bipolar disorder is the depressive phase.  The
> major reason that their life gets off track is the depression.  And with those

10

depressions, of course, become considerable functional incapacity, some of which is the patient's depressive assessment of themselves.  That is, they don't believe that they can do anything.  And some it is that they really . . .  have had a loss of function.  Often depressed patients . . . will describe thinking as if they were trying to get through molasses, that their thinking process was so slow and so disorganized. Most people can recall their own experience with, you know, a depressive day here or there where you have no interest in things, you think everything is going to turn out terrible, your confidence is totally shot.  But these are, in the normal range, exist for a day at a time.  They usually relate to something that just happened to you in the environment.

Tr. I 78:15–79:7.

26.     Fitts described her depressed state as follows:

Since I was discharged from Fannie Mae, my life basically has ended.  It has been hell.  I have slipped into a deep, dark hole that I can't seem to get out of unless I'm in hypomania, and then I think I'm doing things that God tells me to do and that are the right course of action.  I do them impulsively, and I don't realize what mistakes I've made until I crash back into a depression.

And when I am in a depression my thoughts are very negative and pessimistic.  I feel like I am useless, like nothing I can do is right, every decision I make, whether it's in a hypomanic state or a depressed state, gets me deeper and deeper into the hole.  I have tried cognitive therapy to turn around this negative thinking, but I don't really see the positives in my life that I can grab onto to turn anything around.

And I have lost the skills that are needed to be an attorney.  I don't feel I have any talents.  I'm not Van Gogh.  And I don't have confidence anymore in my judgment or my abilities.  And most of the time, my initial reaction is that I can't do things because I end up screwing up.

Tr. II 38:14–39:7.  The court closely observed Fitts during the evidentiary hearing and her

testimony on this subject is credible.

11

**D.      Unum's witnesses confirm that Fitts's diagnosis is bipolar disorder**

27.      Unum's witness Dr. Richard Ratner, the only Unum witness to have evaluated

Fitts in person, testified that, in his opinion, "Ms. Fitts suffers from a mood disorder and, more

specifically, a Bipolar Mood disorder."  Ratner Direct at 4; *see also* Tr. II 66:5–22.  Dr. Ratner, a

Board-certified psychiatrist, is a Clinical Professor of Psychiatry and Behavioral Sciences at

George Washington University Medical School and has treated patients with bipolar disorder.

Ratner Direct at 2; Def. Ex. 1 (Ratner C.V.); Tr. II 83:24-84:6.  Dr. Ratner examined Fitts's

medical records and met with her on three occasions in 2002.  Tr. II 81:18–20.

28.      Unum former medical director Dr. Robert A. Haines testified that, in his opinion,

"the medical evidence supported the diagnosis of bipolar disorder and/or personality disorder,

and that Fitts's capacity to work was impaired by these conditions."  Tr. II 46:4–9.  Dr. Haines, a

Board-certified psychiatrist, was the medical director of Unum Life Insurance Company from

1992 to 2000, when he returned to clinical work in which he has treated patients with mood

disorders.  Def.'s Ex. 23 (Haines C.V.); Haines Direct at 2.  Dr. Haines testified that he had not

examined Fitts and that he could not make a definitive diagnosis.  Tr. II 45:1–2; 48:8–9.  He

acknowledged, however, that he did not dispute Fitts's bipolar diagnoses from Dr. Griffin, Dr.

Hyde, Dr. Goodwin, Johns Hopkins or Georgetown.  Tr. II 47:6–48:7.

29.      Unum's witness Dr. Angela Hegarty reviewed Fitts's records for Unum and made

no diagnosis because she did not evaluate Fitts in person, but she acknowledged that her review

revealed that Fitts had major depressive disorder.  Tr. II 87:16–19; 88:13–17; 95:15–17.  Dr.

Hegarty is a Board-certified psychiatrist, forensic psychiatrist, and neurologist, who, at the time

of the hearing, had just resigned her appointment as a clinical professor of psychiatry at New

York University and the State University of New York at Stony Brook, pending an appointment

as a clinical professor at Columbia University.  Def.'s Ex. 3 (Hegarty C.V.); Tr. II 116:13–16.

Dr. Hegarty acknowledged that it was "possible" that Fitts has bipolar disorder but that it was

"unlikely."  Tr. II 91:13–15.  Dr. Hegarty testified that, in her review of the medical records, it

appeared "very likely [Fitts] had some hypomanic symptoms," and that "a lot of her symptoms

are better explained by a mixed episode," although she was unsure if Fitts had had a manic

episode.  Tr. II 95:10–13.  Under the DSM–IV, however, the occurrence of a mixed episode in a

person with a previous depressive episode indicates a diagnosis of bipolar disorder.  DSM-IV at

390.  Thus, Dr. Hegarty's testimony in this regard supports the finding that Fitts's diagnosis

should be bipolar disorder.

**E.**  **Unum's contentions that Fitts's primary diagnosis should not be bipolar disorder are not persuasive**

**1.**  **Treatment response or adherence are not appropriate criteria**

30.  Dr. Hegarty testified that the fact that Fitts was not taking mood-stabilizing

medications from 1997 to 2004 such as lithium, Depakote or Lamictal without resulting in more

hospitalizations indicated to her that she was not truly suffering from bipolar disorder.  Tr. II

96:11–14.  She specifically noted the absence of lithium and Depakote, which she described as

"critical in prevention of relapse in a bipolar patient."  Tr. II 96:14–17.  Fitts's medical records

reveal, however, reveal evidence to the contrary.  The records show that Fitts was taking

Depakote throughout 1997–98, in 2002, and throughout 2005–06.  *See, e.g.,* Pl.'s Ex. O

(Griffin's Notes 6/3/96; 10/20/97; 2/17/98; 7/12/02; 5/25/05; 9/14/06).  The records also show

that Fitts had been prescribed lithium in 1997, and again when she was hospitalized at Sibley

Memorial Hospital in 2002.  *See* Pl.'s Ex. O (Griffin Report 3/18/97; Griffin Notes 7/12/02;

9/27/02).  Indeed, Fitts was prescribed lithium as early as 1993 and Depakote as early as 1994.

*See, e.g.*, Pl.'s Ex. 26 (Ketter's Notes, 6/26/93; 8/27/94).  Additionally, Fitts was prescribed

Lamictal, a mood stabilizer used to treat bipolar patients, in 1997 and again from 2000 through

2005.  *See* Pl.'s Ex. O (Griffin's Notes 2/28/97; 12/12/00; 5/16/01; 5/8/02;11/18/03; 8/5/04;

7/5/05).

      31.     In the face of this contrary evidence, Unum tries to rehabilitate Dr. Hegarty's

testimony by explaining that Fitts's "dose [of Depakote] was not high enough to be effective,"

because her blood levels were between 46 and 48 in 1998, which Unum asserts was  "well below

the range of 50 to 120 that Dr. Griffin testified is necessary for effectiveness."  Def.'s Response

at 8.  According to the records, however, while Fitts's blood level of Depakote did at times fall

below 50, the records also demonstrate there were times when her blood level was above 50,

contrary to Dr. Hegarty's assertions.  *See, e.g.*, Pl.'s Ex. O (Griffin's Notes 8/22/05 (blood level

58.4); 1/21/98 (blood level 99.4); 4/6/98 (blood level 60).

      32.     Dr. Hegarty is not published in peer-reviewed journals on the subject of bipolar

disorder, and she is not a researcher on the subject.  Tr. II 98:2–16.  Dr. Hegarty based her

criticism of Fitts's diagnosis of bipolar disorder substantially on the timing of Fitts's

hospitalization interludes and her erroneous assessment of her medication records.

Tr. II 95:18–97:1.  Dr. Hegarty fails to persuade the Court that the bipolar diagnosis of Fitts by

the physicians who actually interacted with her, Drs. Goodwin, Griffin, Hyde, Polk, Vittone,

Ketter, the physicians at Johns Hopkins and the physicians at Georgetown, and Unum's witness

Dr. Ratner, are wrong.

33.     Unum also contends that Fitts's failure to respond to treatment and the interludes between her hospitalizations cast doubt on the proposition that bipolar disorder is Fitts's primary diagnosis.  Def.'s Response at 8–9 (asserting that Fitts's poor treatment response is "strong evidence that [she] is suffering from *something in addition* to bipolar disorder and that this is the primary cause of her condition" (emphasis in the original)).  However, Dr. Goodwin testified that at least half of those diagnosed with bipolar disorder do not respond to treatment.  Tr. I 40:17–41:16.  As Dr. Goodwin explained, "bipolar disorder in and of itself, independent of other factors, can have poor treatment response much of the time."  Tr. I 59:12–14.  Dr. Hyde also testified that there is "a subgroup of patients with bipolar disorder that are quite treatment resistive."  Tr. I 121:21–24.

34.     Unum's witnesses did not refute this evidence regarding treatment response.  Dr. Haines testified that "about half of the patients don't get fully better" and a number do not get better at all.  Tr. II 52:1–8.   Dr. Ratner acknowledged that nobody is cured of bipolar disorder; some individuals are merely able to bring it under control.  Tr. II 68:20–22.  Dr. Ratner testified that "treatment is never 100 percent."  Tr. II 69:16.  Although he guessed that the rate of success with "uncomplicated  bipolar disorder" was "somewhere in the 80 percent range," he acknowledged that he had no research to support the 80 percent figure.  Tr. II 69:16–70:10.

35.     Treatment response is not a widely accepted criteria for diagnosing bipolar disorder.  The DSM-IV does not provide for the diagnosis of bipolar disorder based on treatment response.  *See* DSM-IV 382–97; *see also* Tr. II 77:9–13.  According to Drs. Goodwin and Hyde, treatment failure is not one of the diagnostic criteria for determining whether or not a person has bipolar disorder.  Tr. I 84:4–7 (Griffin); Tr. I 130:1–4 (Goodwin).  Dr. Goodwin testified that

15

failure to respond to treatment "would never be the basis for an erroneous diagnosis."  Tr. I

40:17–22.  Although Dr. Ratner testified that he and other practitioners sometimes looks at

treatment response as a basis for diagnosis, Tr. II 77:13–78:18, there is no evidence that this

methodology has attracted widespread acceptance within the relevant scientific community,

given its absence from the DSM-IV and the contrary testimony by Drs. Goodwin and Hyde.

36.     Unum also contends that, by "failing to adhere to the medication regimen

prescribed by her treating psychiatrists, Ms. Fitts essentially is sabotaging the efficacy of the

treatment she is receiving."  Def.'s Proposed Findings at 31.  However, as Dr. Goodwin testified,

"[h]alf of bipolar patients will not comply with their treatment.  And compliance includes not

taking it all or not taking it properly, or changing the doses on your own without telling your

doctor."  Tr. I 85:23–86:3.  Dr. Hegarty acknowledged that non-compliance with drug regiments

is a particular problem with bipolar patients.  Tr. II 106:1–7.

**2.     A diagnostic brain study is not required to show bipolar disorder**

37.     Unum contends that Fitts does not have bipolar disorder because there are no

brain studies showing changes in her brain.  Yet Unum concedes that bipolar disorder "cannot be

diagnosed with a brain scan."  Def.'s Proposed Findings at 48.

38.     Although bipolar disorder is an organic brain disorder associated with

physiological changes in the brain, Goodwin Direct at 4, there is no test that reveals or confirms

the diagnosis of bipolar disorder, and Fitts cannot be required to produce what does not exist in

order to prevail.

39.     Having considered all of the evidence submitted by the parties, the court finds that

Fitts suffers from bipolar disorder.

16

**II.      Fitts is Disabled**

**A.      Fitts cannot perform the duties of her regular occupation nor any occupation for which she is reasonably fitted**

40.      Under the applicable policy language, an individual may receive benefits for 24 months for a mental disability, or 36 months for a physical disability, if she cannot perform the material duties of her regular occupation.  Pl.'s Ex. S, § II (the LTD Policy).  After that period ends, continued coverage is authorized if the insured "cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted taking into consideration training, education, and experience."  *Id.*

41.      In 1995, Fitts's usual occupation was serving as Assistant General Counsel for Fannie Mae.

42.      Fitts's training and education includes: a Bachelor of Arts Degree from Fordham University (1971); a Master of Arts degree from Columbia University (1973); a law degree from Fordham University (1977); a Certificate from the Senior Management Program of the Massachusetts Institute of Technology (1988).  Her professional experience includes: admission to the bars of New York state and the District of Columbia; working in the enforcement division of the U.S. Securities and Exchange Commission; serving as Associate General Counsel and Assistant Corporate Secretary of US Life Corp.; employment at Fannie Mae from 1982 until November 1995, where she rose to the level of Assistant General Counsel responsible for employment-related matters.  Fitts received awards and stock bonuses from Fannie, and earned a salary of $95,000 plus an annual bonus, stock options and fringe benefits including medical, life and disability insurance.   Fitts Direct at 2–4.

43.     Fitts has developed serious cognitive deficits which prevent her from obtaining
employment commensurate with her education, training, and experience.  Goodwin Direct at
5–10.  As her treating physician, Dr. Griffin explained that Fitts's "intellectual decline does not
make it possible for her to work at an occupation commensurate with her education, training, and
experience. . . . Jane can no longer do that type of work or any other comparable work."  Griffin
Direct at 10.  Dr. Hyde testified that bipolar patients are "[v]ery frequently" disabled by their
disease.  Tr. I 130:9–10.  For example, he explained that Fitts would not be capable of carrying
out the functions required by sitting at the security desk of a building because "her attention span,
focus and judgment are sufficient to allow her to function at a security desk."
Tr. I 130:15–18.

44.     The 2004 report from the National Rehabilitation Hospital ("NRH") confirms that
Fitts has suffered significant intellectual decline.  In the tests administered by the NRH, Fitts
scored a full scale intelligence quotient ("IQ") of 87 with a 22 point difference between her
verbal IQ of 97 and performance IQ of 75.  Pl.'s Ex. J at 5 (NRH Neuropsychological Evaluation
6/16/04).  The report stated that these "results are significantly lower than would be expected
when compared with her report of educational and occupational functioning."  *Id.*

45.     In evaluating these results, Dr. Griffin explained:

Perhaps a person with an IQ of 87 can hold a menial job, but it is doubtful that
Jane is capable of doing even a menial job, because of her deep depression.  The
kind of depression Jane has, deprives her of the energy necessary to persistently
do any job and the concentration necessary to complete all but the simplest tasks.
There are many days when Jane just cannot get out of bed and feels she needs to
crawl into a hole.

Griffin Direct at 10.  Dr. Goodwin explained that he would expect someone with Fitts's

educational and professional achievements to have an IQ of 120 or 130.  Tr. I 86:9–13.

46.     Dr. Hyde testified that Fitts's overall IQ was "below average.  It is very low for a

person of Jane's education, training and experience. . . .  I would not expect a Deputy General

Counsel of a major corporation such as Fannie Mae to have an IQ of only 87."  Hyde Direct at 6.

Dr. Hyde observed that a performance IQ of 75 is "very low for a person of Jane's education,

training and experience.  It is in the bottom 20th percentile."  Hyde Direct at 6.  He explained that

such a result "tells us that Jane's reasoning abilities and speed of thinking are now quite low.

Executive function testing showed that Jane could not complete tasks that required more than

simple reasoning.  Her nonverbal learning ability was impaired.  Her ability to reproduce tasks

was disordered."  *Id.*  Dr. Goodwin concurred that the performance IQ "is most related to job

acquisition and job maintaining, and it's also what is most vulnerable to depression."  Tr. I

86:18–21.

47.     Fitts testified that she has "lost the skills that are needed to be an attorney."  Tr. II

39:3–4.

48.     Unum's witness Dr. Haines testified "that Fitts's capacity to work was impaired"

by her condition.  Tr. II 46:4–9.  Dr. Ratner concluded in 2002 that Fitts was "unlikely to be able

to function as an attorney in the foreseeable future."  Def.'s Ex. 4 at 14 (Ratner Report).  Dr.

Ratner suggested that Fitts could perform "moderately sophisticated, if sedentary, work," but

provided no explanation of what that meant.  *Id.*  Unum required that Fitts be examined by a

vocational counselor and Fitts was so examined, but Unum's vocational counselor gave Fitts no

recommendations, Tr. I 187:18–20.  Unum failed to call the vocational counselor as a witness and provided no evidence as to the vocational counselor's evaluation.

49.     Fitts is by training, education, and experience an attorney.  Overall, the evidence shows that, since leaving Fannie Mae, Fitts has not been able to perform the material duties of any occupation similar to that of attorney, even at a low-level position, which would consistently require any of the following skills: reliability, organization, concentration, ability to follow directions, analysis of complex problems or issues, critical judgment, timely decision making, and/or interpersonal skills.

**B.     Unum's contentions that Fitts is able to perform the duties of various jobs are unsupported by the evidence**

50.     Unum contends that Fitts would be capable of reviewing documents for a law firm.  Tr. I 75:3–10.  The weight of the evidence shows, however, that such a job would require analyzing, processing, and assembling information — tasks for which Fitts no longer has the capacity.  As Dr. Goodwin explained, any such job would require an individual "to be able to abstract from enormous amount of detail, the critical, the critical details" and to "be able to extract that against a background of substantial knowledge about what's important and why it's important. It is not a clerical job."  Tr. I 87:20–25.

51.     Nor does the evidence support Unum's assertion that Fitts would be capable of fulfilling the job duties of editing legal publications.  Tr. I 74:14–75:13.  As Dr. Goodwin testified, Fitts would not be capable of fulfilling the duties of an editing job that required proofreading for content nor typographical errors because it would "require[] the kind of functioning that bipolar patients often lose, which is the ability to analyze new stuff and keep old

20

stuff in mind at the same time." Tr. I 89:2–4.  He explained that such jobs require individuals to "access remote memory and . . . to analyze the new stuff, the new information, integrate that to the—with the old information" . . . which is a "very complex cognitive process." Tr. I 89:5–9. Dr. Goodwin explained that the "areas of the brain that involve this complex executive function are areas that have been shown to be affected in bipolar patients and depressed patients." Tr. I 89:21–23.

52.     Unum also suggests that Fitts could be employed as a legal reporter, reporting on pending legislation and its effects.  Tr. I 73:7–10.  Dr. Goodwin testified that in his opinion, to a reasonable degree of medical certainty, that Fitts could not do so "consistently.  I think there would be times when she could pull it off and other times when she wouldn't be able to do it." Tr. I 75:11–13.

53.     Unum failed to tender evidence that credibly refutes the testimony and evidence that Fitts cannot perform each of the material duties of any gainful occupation for which she is reasonably fitted taking into consideration training, education, and experience.  Thus, the court finds that Fitts is currently disabled within the terms of the applicable policy and has been so disabled since 1997.

## III.     Fitts is Disabled Due to Her Bipolar Disorder

## A.     Fitts is disabled by bipolar disorder

54.     Dr. Hyde testified that Fitts is disabled by her bipolar disorder because she is not able to function in the workplace.  Tr. I 130:11–18.  Dr. Griffin testified that "Jane has Bipolar Disorder.  It disables her."  Griffin Direct at 10.

55.     Fitts's bipolar disorder causes her usual state, which is depression.  Depression "causes a distortion of thinking."  Tr. I 73:21–22.  As Dr. Goodwin explained, "the standard explanation for that is lack of self–confidence, hesitancy, negative thoughts about yourself, whereas the reality is better than what you think it is."  Tr. I 73:18–21.  Depression interferes substantially with Fitts's performance, making it impossible for her to consistently perform the usual tasks associated with occupations in her profession.  Tr. I 75:14–17.

56.     As a result of her bipolar disorder, Fitts suffers from increasing cognitive deficits which are disabling.  Dr. Hyde, who has treated her every two or three months since he began treating her, testified that "she is not doing well and that her cognitive deficits have continued to worsen over the years."  Tr. I 95:10–16.  Dr. Hyde explained that the primary cause of Fitts's cognitive deficits is her bipolar disorder, based on his observations that "her functional status is so impaired, her quality of life and her activities of daily living are so circumscribed and limited," and his discussions with Dr. Griffin "about her underlying psychiatric diagnosis, and the well-documented nature of cognitive impairment in patients with severe treatment-resistant bipolar disorder."  Tr. I 115:15–25.  He explained that bipolar disorder is "an extremely disabling illness in some patients."  Tr. I 122:4–5.

57.     Dr. Goodwin testified that, over time, bipolar disorder is associated with significant deterioration in general intellectual abilities in some bipolar patients.  Tr. I 33:7–12.  This is confirmed by longitudinal studies that track individuals and groups of individuals over time.  Tr. I 33:13–34:10.  The loss of cognitive function and deterioration of the brain are documented in the Neurophysiology chapter of *Manic Depressive Illness* and in hundreds of studies.  Tr. I 42:4–5, 12–19.  "[T]here is brain damage that goes on as a result of the episodes,

22

particularly depressive episode where you get secretion of a lot of steroids that are toxic to the brain. And over time, the average bipolar patient loses intellectual function." Tr. I 42:4–10.

58.     Over time, Fitts's IQ has declined, as Dr. Goodwin explained, and there is "a discrepancy between her verbal IQ, which was intact, and her performance IQ . . . which was very impaired. That's a pattern that fits major depression bipolar or not bipolar. And that's not easy to fake, performance IQ." Tr. I 31:4–9. Also, recent tests showed her executive function was "uneven, which is typical" of bipolar disorder. Tr. I 32:19–21. Dr. Goodwin testified that depression frequently causes brain damage: "There are studies now using brain imaging strategies to show changes in areas of the brain, loss of cellular structure. . . [and] there are brain changes associated with depression." Tr. I 75:24–76:9.

59.     Unum's witness Dr. Ratner testified that he "would agree that as a person with bipolar disorder decompensates, in other words, as they decompensate into either depression or mania, then their cognitive functions also deteriorate in step with that." Tr. II 71:23–72:2. He testified that when bipolar patients are suffering depression or mania, their cognitive dysfunction worsens, becomes more clear, more obvious, more pronounced and worse. Tr. II 73:18–74:1. He explained that if a bipolar patient "does well" then "any likelihood of cognitive decline is going to be very subtle and only occur over a very, very long period of time," and that cognitive dysfunction was not "a feature of bipolar disorder, per se." Tr. II 72:9–20. However, Dr. Ratner acknowledged that he had not conducted research or studies on the subject of declining cognitive impairment of bipolar patients, and he conceded that Dr. Goodwin is more of an expert on the subject than Dr. Ratner. Tr. II 74:2–11. Moreover, Dr. Ratner's testimony on this point does not refute the evidence of Fitts's cognitive deficits, because Fitts has not "done well," but in fact has

experienced many treatment-resistant episodes of prolonged depression, which are known to cause cognitive dysfunction.

60.     Unum's expert witness Dr. Hegarty also agreed that functional impairment can be a problem for people with bipolar disorder.  Tr. II 113:22–25.

61.     Fitts has had no paying jobs since she left Fannie Mae in 1995.  Fitts Direct at 5. Since 1995, Fitts's depression has caused her to live an isolated life in which she does not go outside very often.  *Id.* at 7.  She tries to leave the house occasionally, three or four times a week, for such simple errands as going to the grocery store.  Tr. I 176: 8–23.  On days when she is in deep depression, she will stay in bed for most of the day.  Fitts Direct at 7.

**B.     Fitts's inability to work is due to her illness, not her lack of effort**

62.     Since 1995, Fitts has made good faith attempts at obtaining both volunteer and pay positions; however, her bipolar condition has prevented her from achieving any level of success in these efforts.  Fitts worked with a counselor at the Georgetown School of Foreign Service, who helped her redo her resume prior to her hospitalization in 2004, which curtailed her attempt to secure employment in corporate communications.  Tr. I 186:9–187:20.  Fitts applied to serve as a driver for the elderly but discovered that insurance would not permit her, and she placed ads in a local paper to act as a companion to transport the elderly, but no one responded to these ads.  Tr. I 188:8–24.

63.     Since 1995, Fitts also volunteered, with no more than limited success, as a chef's assistant at L'Academie Cuisine, at the information desk and surgical waiting desk at Sibley Memorial Hospital, in the greenhouse and at the subscription desk of Hillwood Museum.  At Hillwood, Fitts testified, "I did not do well at selling subscriptions because I do not do well

interacting with people when I am depressed; I become stressed." Fitts Direct at 10.  Ultimately, her mixed state episode in 2004 made it difficult for her to sit still for too long and she stopped volunteering there.

64.     In the past year, Fitts has volunteered for 1–2 hours a week as a deliverer of meals for Meals on Wheels, although she has faced challenges meeting these simple obligations.  At Meal on Wheels, Fitts explained that she has had "some mishaps, in that several times I have forgotten to put a hot meal in the package to be delivered.  Because of my depression and headaches I cannot commit to Meals on Wheels, but they have been accommodating and allow me to call and commit to work on the morning of an assignment."  Fitts Direct at 10.

65.     Contrary to allegations made by Unum, Fitts also attempted extensive cognitive therapy and psychotherapy.  Fitts saw Dr. Phillip Appell at NRH for cognitive rehabilitation; she was treated by Father Richard McHugh, who is a specialist in neurolinguistic programming and cognitive rehabilitation; and she attended a memory course at the Institute for Learning and Retirement.   Tr. II 13:17–21, 14:2–10; Pl.'s Ex. P (Hyde Notes 8/16/00).  Dr. Griffin also testified that Fitts "has had several fairly lengthy periods of psychotherapy," lasting from several months to a year each, "aimed at treating not only depression, but personality coping styles as well."  Tr. I 142:5–9.

**C.    Unum has not met its burden to prove that Fitts's disability is caused by an excluded disorder**

**1.    Unum has not proven that Fitts's primary disabling diagnosis is borderline personality disorder**

66.    Unum contends that borderline personality disorder, not bipolar, is Fitts's primary disabling diagnosis, but that contention is not supported by the evidence.

67.    Borderline personality disorder is characterized by a pervasive pattern of instability in interpersonal relationships, self–image problems, and marked impulsivity that begins in early adulthood.  DSM-IV at 710.  Criteria for diagnosis include presentation of at least five of the following: (1) frantic efforts to avoid real or imagined abandonment; (2) pattern of unstable and intense relationships which alternate between extremes of idealization and devaluation; (3) persistently unstable self–image; (4) impulsivity in at least two high risk areas, including: spending, sex, substance abuse, reckless driving, binge eating); (5) recurrent suicidal or self–mutilating behavior; (6) short, intense episodes of mood disturbances, such as anxiety, depression, or irritability; (7) chronic feelings of emptiness; (8) inability to control anger; and/or (9) transient, stress–related paranoia or dissociation.  *Id.*

68.    For purposes of classification, the DSM-IV has divided disorders into four axes. Borderline personality disorder is classified as an "Axis II" disorder.  DSM-IV at 29.  Bipolar disorder is an "Axis I" disorder.  *Id.* at 28.  The DSM-IV cautions that clinicians "must be cautious in diagnosing Personality Disorders during an episode of a Mood Disorder" because a mood disorder, such as bipolar disorder, may have "features that mimic personality traits."  *Id.* at 688.  A personality disorder "should be diagnosed only when the defining characteristics

appeared before early adulthood, are atypical of the individual's long term functioning, and do not occur exclusively during an episode of an Axis I disorder." *Id.*

69.     Although Dr. Hegarty concluded that Fitts's history is more consistent with a personality disorder, she acknowledged that there is no evidence that Fitts displayed the defining characteristics of a disabling personality disorder before Fitts sent letters to the chairman of Fannie Mae suggesting that there was a romantic relationship between them. Tr. II 107:11–112:7. Dr. Hegarty also conceded that "the clinicians who spend more time interacting with the patient are the ones who find it easier to apply the [DSM-IV] and make the diagnosis because they have more information." Tr. II 113:14–21.

70.     Dr. Ratner concluded that Fitts had borderline personality disorder in addition to bipolar disorder, Ratner Direct at 5, but he also agreed that "with time and more experience with the interactions with a patient, the distinction between whether the patient has bipolar disorder or a personality disorder such as borderline personality disorder becomes easier" and that "the doctor who has had to most interactions with Ms. Fitts is Dr. Griffin." Tr. II 79:9–17.

71.     Dr. Haines concluded "that the medical evidence supported the diagnosis of bipolar disorder and/or personality disorder," Tr. II 46:4–9, but he "made no diagnosis of a personality disorder of Fitts," Tr. II 55:13–15. He agreed that in many cases, with time and experience with a patient it is easier to make a distinction between bipolar disorder and personality disorder. Tr. II 51:9–13.

72.     Unum asserts that Fitts has been "diagnosed" with borderline personality disorder since 1988, but the evidence on which Unum relies does not support the contention that borderline personality disorder is her primary or disabling diagnosis. Unum points to Dr.

27

Ketter's notes from his initial evaluation of Fitts in 1988, but the notes merely show that Ketter considered whether Fitts had borderline personality traits in addition to bipolar disorder.  Def.'s Ex. 26 (Ketter's Notes).  Unum also points to Dr. Polk's observation after interviewing Fitts once that "there may well be Borderline Personality Disorder" in addition to bipolar disorder.  Def.'s Ex. 9 at 2 (Polk Letter).  Ultimately, however, both Drs. Ketter and Polk diagnosed Fitts as having bipolar disorder.  *Id.*  Similarly, when Fitts was hospitalized two separate times in 1997, the attending physicians at Johns Hopkins and at Georgetown University noted that she had traits of a personality disorder, but those doctors concluded that she had bipolar disorder.  *See* Pl.'s Ex. E at 4; Pl.'s Ex. G at 4 (Georgetown).

73.     Fitts's current treating physicians have concluded that borderline personality is not Fitts's primary or disabling diagnosis.  Although Dr. Griffin acknowledged that Fitts had many borderline personality traits, she explained that she did not give Fitts a primary diagnosis of borderline personality disorder because "Jane is so seriously ill with Bipolar Disorder, that that overwhelms any attempt to make an Axis II diagnosis."  Griffin Direct at 10.  As she explained further, "if you could not control Jane's severe depression from the Axis I Bipolar disorder, but could control or cure what you thought to be Axis II personality disorder features, the patient's ability to function would remain severely impaired.  Similarly, if you could improve her Axis III general medical condition, her ability to function would remain severely impaired even though she would, in a medical sense, be more healthy than she had been."  *Id.* at 7.

74.     Dr. Griffin explained that there were other factors that lead her to conclude that a borderline personality disorder was not the primary cause of Fitts's condition.  Fitts had episodes of psychosis, which "is an exclusion for personality disorder."  Griffin Direct at 10.  Among the

other factors taken into account by Dr. Griffin are that Fitts had sustained episodes of mood

swings which borderline personality disorder does not cause, that she had several lengthy

hospitalizations for bipolar disorder, and that she underwent electroshock treatment for severe

depression (which Dr. Griffin also explained is not a treatment for personality disorder).  *Id.*

With respect to behavior that Dr. Ratner called narcissistic, such as plastic surgeries, Dr. Griffin

explained:  "The behaviors that others call narcissistic, I call desperate behaviors of a very sick

woman.  I think that is not narcissistic or self–dramatizing, but rather a very sick, a very

distressed person trying desperately to feel better."  Tr. I 138:21–25.

       75.     Dr. Goodwin confirmed Dr. Griffin's diagnostic technique, explaining that

> bipolar disorder is such a serious disorder, that in its presence, possible personality
> disorders become nearly irrelevant.  Personality disorders in themselves do not give rise
> to the cognitive deficits and severe mood swings that exist with bipolar disorder.
> Personality disorders in themselves rarely prevent a person from working productively.
> Bipolar disorder that Jane has does.  Being concerned about personality disorder when a
> person is bipolar is like trying to arrange the deck chairs on the Titanic.

Goodwin Direct at 11.  Dr. Goodwin also testified that Fitts's achievements in early adulthood

are not consistent with disabling borderline personality disorder.  Tr. I 81:22–82:18.

       76.     Dr. Hyde testified that in his experience, personality disorders are usually apparent

in young adulthood and have a "profound impact of their life and life functioning from that age

of onset," while mood disorders, "particularly bipolar disorders, have a later age of onset."  Tr. I

124:9–12.  The fact that Fitts's onset was later in life appeared to Dr. Hyde "to be more

consistent with a bipolar disorder than a personality disorder."  Tr. I at 124:13–14.

       77.     Moreover, a diagnosis of borderline personality disorder does not exclude the

conclusion that Fitts's is disabled by bipolar disorder.  According to the DSM-IV, borderline

personality disorder is a condition that is often associated with bipolar disorder, similar to other conditions, such as bulimia or social phobia.  DSM-IV at 394.  A diagnosis of bulimia or social phobia in addition to bipolar disorder would not compel the conclusion that *those* conditions were the cause of an individual's disability, anymore than a diagnosis of borderline personality disorder would.

**2.    Unum has not proven that Fitts's conditions are better explained by a somatoform disorder**

78.    Unum's contentions that a somatoform disorder or factitious disorder are the likely cause of Fitts's disability are equally unpersuasive.

79.    A somatoform disorder is characterized by the presence of physical symptoms that are not fully explained by a general medical condition or other known disorder.  DSM-IV at 485. A factitious disorder is characterized by physical or psychological symptoms that are intentionally produced or feigned in order to assume a "sick role."  *Id.* at 513.  And a malingerer is one who produces symptoms intentionally for an obvious reason (to avoid an obligation such as work or jury duty).  *Id.*

80.    Unum points to symptoms that Fitts has complained of over the years that it contends have no known cause: weakness of extremities, spastic movements, imbalance, headaches, restless legs, pain in her feet and memory loss.  Def.'s Proposed Findings at 51–52. Unum also notes that Fitts would benefit financially from being sick.  *Id.* at 52.

81.    Some of the symptoms on which Unum bases its contention are explainable by Fitts's undisputed diagnoses of an andrenogenital disorder and Cushing's disease, a hormonal

disorder.  Dr. Haines agreed that if a medical condition explains the symptoms, then, by

definition, a somatoform disorder cannot be diagnosed.  Tr. II 53:8–10.

82.     Fitts first developed symptoms of Cushing's in 2001 — full cheeks, bruising on

her arms and legs, and unexplained weight gain.  Tr. II 33:15–20.  In 2002, she developed the

characteristic hump on her back and a blood test confirmed a diagnosis of Cushing's disease.  Tr.

I 168:23–169:7.  The National Institute of Health later confirmed the disease was due to a tumor

on her pituitary gland.  Tr. I 183:8–12.  In September 2005, she had another full blown Cushing's

episode and was admitted to the University of Virginia hospital, at which time they removed the

frontal lobe of her pituitary gland.  Tr. II 34:19–35:11.

83.     Dr. Hegarty acknowledged that symptoms of Cushing's Disease include muscle

weakness, headaches, weight gain, disfigurement (such as facial hair, a buffalo hump, thinning of

the skin, easy bruising), and other very severe consequences.  Tr. II 99:13–100:5.  Fitts also had a

lifetime adrenogenital disorder diagnosed in 1985.  When asked whether Cushing's and an

androgenital disorder give patients "a lot of problems," Dr. Hegarty conceded that they do.  Tr. II

101:19–23.

84.     To those symptoms, one must add Fitts's lifelong history of headaches, her

bipolar disorder, and the side effects of all of the medications she has been taking.  Taken as a

whole, the evidence does not support Unum's contention that Fitts's symptoms have "no known

cause" nor does it support the assertion that she is disabled by somatoform or factitious disorder.

85.     Nor does the court find that Fitts is feigning her memory loss or other cognitive

decline, which have been sufficiently observed by her physicians in addition to her own

subjective reports.  The court is not persuaded by the results of the Wechsler Memory Scale,

31

Revised ("WMS-R") and the Test of Memory Malingering ("TOMM"), administered by Dr. Robert K. Madsen on June 13, 2002, because of the conditions under which they were administered.  The WMS-R measures memory, and the TOMM is designed to shed light on whether a patient's memory loss is feigned or exaggerated.  According to Dr. Madsen, the results of the WMS-R were "beyond the pale of logical acceptability" and the TOMM indicated the "real possibility of malingering, perhaps more unconscious than conscious," with regard to Fitts's memory loss.  Def.'s Ex. 5 at 4 (Madsen's Report).

86.     Dr. Madsen did not, however, take into account that as recently as May 24, 2002 — three weeks prior to the test — Fitts had been told that she might have a tumor on her pituitary gland, for which she was advised she would be required to undergo a painful invasive procedure. *See* Ex. O (Griffin's Notes).  Before taking the test, Fitts notified Dr. Madsen that she was feeling very anxious and depressed at the prospect of such a procedure and did not think it was a good time to take the exams, but the exams were administered anyway.  Tr. II 29:7–10   Dr. Hyde testified that Fitts's anxiety due to her recent diagnosis with a potential tumor could "[a]bsolutely" have interfered with the results of the tests.  Tr. I 127:2–23.  Thus, the court finds the exams to be of limited probative value.

**3.     Fitts's history of elective surgery, her travel, and her renovation of her home are not inconsistent with being disabled by bipolar disorder**

87.     Unum contends that Fitts's history of elective surgery is indicative of a narcissistic personality disorder.  Def.'s Proposed Findings at 32.  Unum points to the fact that she has had laser eye surgery, eyelid and jowl surgery, breast enlargement, and two nose surgeries.  One of her nose surgeries was against medical advice.  Tr. I 54:16.

88.     First, there is no indication that laser eye surgery — which is common — is
probative of a narcissistic disorder.  Second, attempts to change one's personal appearance to
appear more attractive, especially ones that are impulsive or risky, are consistent with a diagnosis
of bipolar disorder.  DSM-IV at 359.  While Drs. Griffin and Goodwin concurred that these
behaviors could be described as narcissistic, they also testified that, in these circumstances, the
surgeries are indicative of a depressed woman seeking to improve a low self–image, which is
entirely consistent with a diagnosis of bipolar disorder.  *See* Tr. I 138:23–25 (Griffin);
82:19–83:24 (Goodwin).

89.     Unum's contentions that her travel or her "successful" renovation of her home
establish that she is not disabled by bipolar disorder are equally unconvincing.  Fitts testified that
she had traveled to Australia, India, Nepal, and several U.S. cities since 1995.  Tr. I
174:18–176:7.  Fitts also testified that she sold her home in 2004 for $925,000, after taking out a
$400,000 mortgage and spending $350,000 to renovate it.  Tr. I 172:14–20.  She estimated that
she earned about $70,000.  Tr. II 38:8–10.  As Fitts points out, her "successful" renovation
yielded about an eight percent profit, or less than three percent per year (since purchasing in
2001).  Pl.'s Response at 18.   To generate this small profit, Fitts sank an amount equal to more
than sixty percent of the original purchase price into the home.  *Id.*

90.     Impulsive or ill-advised behavior, whether it be travel or a risky financial venture,
are characteristic of an individual in a manic state, and such behavior hardly refutes the
conclusion that Fitts is disabled by bipolar disorder; indeed, it serves to corroborate that she
experienced manic episodes.  *See* DSM-IV 358–59.  In 1995, for example, Fitts put in a bid on a
house because she was in a "mixed state," according to Dr. Ketter's notes.  Def.'s Ex. 26 (Ketter

33

Notes 5/30/95).  When Fitts was hospitalized at John Hopkins in December 1997, she told her

physician that she had previous manias when she "bought three fur coats, a couple of houses,

jewelry, took many trips, leased a car and had a number of plastic surgeries."  Pl.'s Ex. E at 2

(Georgetown Final Progress Note 12/3/97).  Shortly after that hospitalization, she started

planning her trip to Australia.  Pl.'s Ex. O (Griffin Note 1/6/98).

91.     The evidence indicates that in 2004, Fitts was in a mixed state, and a month

following the sale of her house, her condition was so uncontrollable that she was hospitalized at

Georgetown University Hospital at Dr. Griffin's instigation.  Fitts reported having fallen into a

"depression" because of the sale and the impending move.  Pl.'s Ex H (Georgetown Discharge

Summary 7/27/04).  Regarding such poor decisions, Fitts testified, "I do them impulsively, and I

don't realize what mistakes I've made until I crash back into a depression."  Tr. II 38: 18–20.

The court concludes that such evidence supports, rather than undermines, her contention that she

is disabled by bipolar disorder.

92.     Accordingly, based on all of the evidence submitted by the parties, the court

concludes that Fitts is disabled by bipolar disorder.

## CONCLUSIONS OF LAW

**I.      Preliminary Matters[6]**

**A.     Unum's motion to exclude**

1.     Unum filed a motion to exclude the presentation of any evidence regarding

plaintiff's medical history after June 2003, on the grounds that plaintiff did not file any

---

[6] Shortly before the evidentiary hearing, both sides filed motions *in limine* to exclude
evidence.  The court proceeded to take the evidence subject to a ruling that such evidence  would
be disregarded were the court to find that the motions were meritorious.

supplemental discovery or expert reports since that time, pursuant to Federal Rules of Civil Procedure 26 & 37. Fitts contends that Unum was given a complete authorization to obtain her medical records throughout the pendency of this proceeding, and thus Fitts was under no obligation to produce them.

2. It is "well-established that discovery need not be required of documents of public record which are equally accessible to all parties." *Dushkin Publ'g Group, Inc. v. Kinko's Service Corp.*, 136 F.R.D. 334, 335 (D.D.C. 1991) (internal quotation marks omitted) (declining to compel production of documents publicly available from court clerk); *Baum v. Village of Chittenango*, 218 F.R.D. 36, 40 (N.D.N.Y. 2003) (denying motion to compel production as unnecessary where transcript was public document and "equally accessible to all."). To the extent that Unum complains about records of which it was aware and which it had authority to obtain, the motion is denied.

3. However, Unum also objects to certain records it claims not to have known about, such as Fitts's evaluation by NRH in 2004, events in Fitts's life post-2003, or Dr. Goodwin's 2006 examination of her, and thus could not have been expected to request such records. In determining whether Rule 37's "severe sanction" of excluding witnesses is justified, the court should consider the resulting prejudice to the other party or to the judicial system. *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996).

4. Unum's complaint that Fitts did not disclose "events in [her] life after 2003," Def.'s Proposed Findings at 65, is too broad to even consider; Fitts has no ongoing obligation to notify Unum of every single occurrence in her life. Moreover, the court finds no prejudice to Unum with respect to the documents it seeks. As its own submissions reveal, Unum's witnesses

35

appear to have had enough time to review the NRH report to incorporate it into their direct testimony. *See* Ratner Direct at 10; Madsen Direct at 6.  And Unum would have had plenty of notice of her 2004 hospitalization at Georgetown, her 2005 surgery for a pituitary tumor, or her 2006 evaluation by Dr. Goodwin, if it had requested the documents from her doctors that it was authorized to receive.  Finally, Dr. Goodwin's opinion had not changed in 2006 from his first opinion, in 1996, and thus Unum suffered no surprise that would prejudice its ability to cross-examine him.  Thus, the court concludes that the admission of this evidence doe not prejudice Unum and its motion to exclude is denied.

**B.      Fitts's motion to exclude**

5.      Fitts also moved to exclude certain testimony of Drs. Hegarty, Ratner, and Haines on the grounds that they were not designated as expert witnesses under Federal Rule of Civil Procedure 26(a)(2) and that their testimony is not relevant.  The court rejects these contentions.  As Unum notes, Fitts's objection to Unum's failure to file a formal witness report "rings hollow in light of the fact that Dr. Goodwin did not file such a report."  Unum's Proposed Findings at 70.  Moreover, the opinions and testimony of Drs. Hegarty, Ratner, and Haines have not changed since their testimony was filed in 2003, and thus Fitts suffered no prejudice by their admission at the evidentiary hearing.  Finally, the court finds that their testimony was relevant to the question of whether Fitts is disabled by bipolar disorder.  Accordingly, the court denies Fitts's motion to exclude as well.

**C.      Issue of Fitts's disability is ripe**

6.      Unum contends that it is premature to make a determination as to whether Fitts is disabled under the policy.  Unum also contends that this court should hold another hearing on

this matter at which it would present evidence regarding Fitts's suitability for various occupations.

7.     Under the applicable policy language, an individual may receive benefits for 36 months for a physical disability if she cannot perform the material duties of her regular occupation.  Pl.'s Ex. S, § II (LTD Policy).  After that period ends, continued coverage is authorized if the insured cannot perform the material duties of any gainful occupation for which she is reasonably fitted given her training, education or experience.  *Id.*  Unum originally determined that Fitts's disabling disorder was mental, and stopped paying her after 24 months.  Unum asserts the determination of her receipt of continued benefits is not ripe until she has received 36 months of benefits.

8.     The court disagrees.  Fitts has suffered from bipolar disorder since 1995, and she became entitled to the balance of the 36-months disability at the time her benefits were cut off in 1997.  Thus, the issue of her continuing coverage was ripe as of 1997.

9.     Moreover, her continuing disability as defined by the policy was the stated purpose of this phase of the litigation, including the court's evidentiary hearing.  *See* Order of Feb. 23, 2006 at 8 (describing this phase of discovery as "addressing whether or not Fitts remains disabled within the terms of Unum's disability plan.").  Any contention otherwise by Unum is unsupported by the record in this case.

**D.     Remand to a plan administrator is not required**

10.     The district court reviews denial of ERISA plan benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan," in which case the administrator's decisions are reviewed for abuse of discretion. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The policy does not grant Unum discretion and thus, the administrator's determinations must be reviewed de novo. *Fitts v. Fed. Nat'l. Mortgage Ass'n*, 236 F.3d 1, 5–6 (D.C. Cir. 2001).

11.     Unum contends that if an ERISA beneficiary has wrongfully been denied benefits based on an incorrect interpretation of a plan provision, the claim must be remanded to the plan administrator for a new determination under the correct interpretation. Def.'s Response at 29 (citing, *e.g.*, *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 951 (9th Cir. 1993) (remand to administrator required to determine whether disability caused solely by depression or also by headaches). The cases requiring remand, however, are those in which the plan administrator exercises discretion. *See id.* at 946. In this case, however, the plan exercises no discretion, and the court's review is a de novo determination of whether Fitts is entitled to benefits under the terms of the policy. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). Remand to a plan administrator is not necessary where the court develops a factual record in making its de novo determination. *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 n.4 (7th Cir. 1994) (remand to administrator is not required where the court hears additional evidence on de novo review); *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 n.6 (4th Cir. 1993) (same).

II.     **Fitts is Disabled by Bipolar Disorder**

A.      **Fitts has proven her claims by a preponderance of the evidence**

12.     The burden rests on the plaintiff to prove that she suffers from a disease that is covered by the applicable policy, and that she is disabled within the meaning of the applicable policy. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 494 (D.C. Cir. 1998).  Fitts has proven by a preponderance of the evidence that she suffers from bipolar disorder, that she is disabled within the meaning of the applicable policy, and that her disability is caused by bipolar disorder.

13.     The diagnosis that Fitts has bipolar disorder, which is a diagnosis made by all physicians who personally evaluated or treated Fitts, is consistent with Fitts's medical history and with the evidence that has been presented in this case.  Unum failed to present any expert who credibly disputed, or to present any other evidence that credibly undermined, Fitts's longstanding diagnosis of bipolar disorder.  The court also closely observed Fitts during the trial.  Having considered and weighed all of the evidence and the credibility of the witnesses, the court finds that Fitts suffers from bipolar disorder.

14.     Fitts has also proven that she is disabled within the meaning of the policy.  Fitts is disabled and cannot perform the material duties of any gainful occupation for which she is reasonably fitted taking into consideration her training, education and experience.  A person "trained and experienced in a highly skilled trade or profession need not seek out work which is personally degrading and insubstantially remunerative." *Blaustein v. Connecticut General Life Insurance*, 207 F. Supp. 223, 224–25 (D.D.C. 1962).  Unum did not present any credible

evidence that Fitts would be able to consistently perform the material tasks required of an occupation for which she is reasonably fitted given her background and experience.

15.     Fitts has also proven that she is disabled by bipolar disorder.  Unum's contentions that her disability was caused by a personality disorder, a somatoform disorder, a factitious disorder, or some other mental disorder were not credible nor supported by the evidence.

**B.      Unum has failed to prove that Fitts is disabled by an illness that is excluded from coverage**

16.     When an insurer contends that an individual's illness falls within the exclusionary clause of the policy, the burden of proof rests on an insurer to prove the requisite facts.  *Cameron v. USAA Property and Cas. Ins. Co.*, 733 A.2d 965, 969 (D.C. 1999) ("Where an insurer attempts to avoid liability under an insurance policy on the ground that the loss for which recovery is sought is covered by some exclusionary clause, the burden is on the insurer to prove the facts which bring the case within the specified exception." (internal quotation marks and citation omitted)); *see also Moore v. Blue Cross and Blue Shield of Nat. Capital Area*, 70 F. Supp. 2d 9, 25 (D.D.C. 1999).

17.     Based on the findings of this court, Unum has failed to prove by a preponderance of the evidence that Fitts is disabled by something other than bipolar disorder.  Accordingly, Fitts is entitled to benefits under the LTD policy.

**CONCLUSION**

For the foregoing reasons, Fitts is entitled to judgment requiring Unum to pay her past disability benefits under the policy from the date on which Unum ceased paying such benefits until the entry of judgment, together with interest computed as due for breach of an insurance contract at six percent per annum, pursuant to D.C. Code § 28-3302(c).[7] Fitts is also entitled to judgment requiring Unum to pay her future disability benefits under the policy from and after the date on which judgment is entered until her sixty-fifth birthday.  Finally, Fitts is entitled to costs other than attorneys' fees, pursuant to Federal Rule of Civil Procedure 54(d)(1).

An appropriate order accompanies this memorandum.


Henry H. Kennedy, Jr.
United States District Judge


Dated: May 7, 2007

---

[7]  The D.C. Code provides, in relevant part, that the rate of interest on judgments shall be "70% of the rate of interest set by the Secretary of the Treasury pursuant to [26 U.S.C. § 6621]] for underpayments of tax to the Internal Revenue Service, rounded to the nearest full percent." D.C. Code § 28-3302(c).  The rate for underpayments of tax is the federal short-term rate, which was 4.9 percent in April 2007, plus 3 percentage points.  *See* 26 U.S.C.A. § 6621(a)(2).  Thus, the applicable rate of interest is 6 percent.